**UNITED STATES of America, Plaintiff,**

v.

**CENTRAL LIVESTOCK CORPORATION, Defendant.**

No. 85–1065–K.

United States District Court, D. Kansas.

Aug. 26, 1985.

Stephen K. Lester, Asst. U.S. Atty., Wichita, Kan., for plaintiff.

Forrest James Robinson, Jr., Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

Plaintiff filed this suit seeking damages for defendant's conversion of certain livestock in which the Farmers' Home Administration (FmHA) held an allegedly perfected security interest. The Court's jurisdiction is provided in 28 U.S.C. § 1345. Defendant Central Livestock Corporation (Central) answered and raised a number of affirmative defenses, one of which denied the FmHA held a perfected security interest in the livestock. Central then filed a motion to dismiss under F.R.Civ.P. 12(b)(6), or in the alternative for summary judgment under F.R.Civ.P. 56, arguing the FmHA possesses only an unperfected security interest because its financing statement lapsed under K.S.A. 84–9–403(2). As a result plaintiff's interest is inferior to, and defeated by, the rights of defendant, a purchaser for value. The Court agrees.

The facts of this case, taken in the light most favorable to plaintiff, are as follows.

At various times from June, 1978, through February, 1981, the FmHA loaned a total of $35,700.00 to Alan R. Allison. He executed promissory notes and granted the FmHA a security interest in various crops, livestock, farm machinery and other equipment. On May 22, 1978, the FmHA filed a financing statement covering this collateral with the Register of Deeds of Kiowa County, Kansas. At no time thereafter did the FmHA file any continuation statements.

Sometime in 1981, Allison sold to Central a number of boars, sows and pigs valued at $29,775.81. This livestock was subject to the FmHA's security interest. There is no evidence the agency was aware of, or consented to, the sale.

Allison defaulted on the FmHA loans, although plaintiff does not specify when that occurred. The present suit against Central, seeking damages for conversion, was filed January 23, 1985.

The first question raised by Central's motion to dismiss or for summary judgment is whether this Court should apply Article 9 of the Kansas Uniform Commercial Code, K.S.A. 84-9-101 *et seq.*, to determine the parties' rights. Plaintiff contends it should not, because the FmHA is a federal agency entitled to application of federal common law rather than state law.

Both parties rely on the Supreme Court's decision in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). *Kimbell Foods* was actually two consolidated cases. The first concerned two competing perfected security interests in the same personal property. The United States' lien secured a loan guaranteed by the Small Business Administration (SBA), while the private lien, arising from security agreements preceding the federal guarantee, secured advances made by a private corporation after the federal guarantee. Both security interests were perfected under Texas' Uniform Commercial Code, and the question was, which of the creditors had priority? In the second case, the FmHA perfected a security interest in certain crops and farm equipment by filing a standard FmHA financing state-

ment with state officials. A private individual later acquired a lien under state law by retaining possession of the tractor after the borrower failed to pay repair bills. The borrower filed for bankruptcy and the government sought to obtain possession of the tractor. The question in that case was whether the adequacy of the description of the collateral in the FmHA financing statement was to be tested under state or federal law. *Kimbell Foods*, 440 U.S. at 718–725, 99 S.Ct. at 1453–1457.

The Supreme Court phrased the common issue as "whether contractual liens arising from certain federal loan programs take precedence over private liens, in the absence of a federal statute setting priorities." *Kimbell Foods*, 440 U.S. at 718, 99 S.Ct. at 1453. Looking first to the government interests implicated by nationwide federal programs, the Court noted there was little question federal law governed cases involving the United States' rights arising under those programs. The more difficult question concerned the content of the federal law to be applied. The Court held that "absent a congressional directive, the relative priority of private liens and consensual liens arising from these Government lending programs is to be determined under nondiscriminatory state laws." *Id.* at 740, 99 S.Ct. at 1465.

In reaching that decision the Court looked at the need for uniform controlling rules in these cases, the degree to which application of state law would frustrate specific objectives of the federal programs, and whether application of a federal rule would disrupt commercial relationships predicated on state law. On all three points the Court concluded state commercial codes furnish convenient solutions as well as adequate protection of federal interests. *Kimbell Foods*, 440 U.S. at 728–729, 99 S.Ct. at 1458–1459. Adoption of a uniform federal law was unnecessary because both the SBA and the FmHA regulations mandate compliance with state law and procedures for "perfecting *and maintaining* valid security interests...." *Id.* at 731, 99 S.Ct. at 1460 (emphasis added).

Thus, the agencies' own operating practices belie their assertion that a federal rule of priority is needed to avoid the administrative burdens created by disparate state commercial rules. The programs already conform to each State's commercial standards. By using local lending offices and employees who are familiar with the law of their respective localities, the agencies function effectively without uniform procedures and legal rules.

*Kimbell Foods*, 440 U.S. at 732, 99 S.Ct. at 1460. Application of state law will not frustrate the specific objectives of the loan programs because the government is in substantially the same position as private lenders. Finally, the Court concluded application of a different federal rule would seriously disrupt commercial relationships established under state law.

Creditors who justifiably rely on state law to obtain superior liens would have their expectatons thwarted whenever a federal contractual security interest suddenly appeared and took precedence.

Because the ultimate consequences of altering settled commercial practices are so difficult to foresee, we hesitate to create new uncertainties, in the absence of careful legislative deliberation. Of course, formulating special rules to govern the priority of the federal consensual liens in issue here would be justified if necessary to vindicate important national interests. But neither the Government nor the Court of Appeals advanced any concrete reasons for rejecting well-established commercial rules which have proven workable over time. *Thus, the prudent course is to adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation.*

*Id.* at 739–740, 99 S.Ct. at 1464 (emphasis added).

This Court cannot gainsay the following observations:

The importance of the *Kimbell Foods* cases is that federal lending agencies are clearly governed by the same rules which control the rights and duties of private secured parties. With respect to filing and perfection, priorities, and default provisions, federal agencies will be measured by the same standards as commercial banks, credit unions, finance companies, and credit sellers. This means uniformity, which is the hallmark of the UCC. If Congress desires to establish a special rule to give protection to a federal lending agency, it may do so. At this writing, however, the only federal statutes which preempt Article I are ... statutes geared to unique types of collateral rather than federal lending agencies as creditors.... *Kimbell Foods* reinforces the notion that Article 9 should continue as the paramount law of secured transactions unless Congress speaks out loudly.

Clark, The Law of Secured Transactions Under the Uniform Commercial Code, ¶ 1.8[1][g] (1980).

Following the *Kimbell Foods* decision a number of courts have applied state commercial law to resolve priority conflicts involving federal lending agencies. *See United States v. Lattauzio*, 748 F.2d 559 (10th Cir.1984) (New Mexico UCC applied in an SBA suit upon a guarantee of a government loan); *United States v. Southeast Miss. Livestock Farmers Ass'n*, 619 F.2d 435 (5th Cir.1980) (Mississippi UCC applied to assess legal sufficiency of FmHA's security agreements and financing statements); *United States v. Burlington Industries*, 600 F.2d 517 (5th Cir.1979) (Florida commercial law applied to determine priority between SBA security interest and competing warehouseman's lien); *United States v. S.K.A. Associates*, 600 F.2d 513 (5th Cir.1979) (Florida non-UCC law allowed landlord's lien to prevail over SBA's Article 9 security interest); and *United States v. Oakley*, 483 F.Supp. 762 (D.Ark. 1980) (adequacy of description of collateral in FmHA's security agreement must stand or fall under Arkansas UCC). Notably, the only two cases to date which have relied on *Kimbell Foods* for the conclusion the respective federal interests involved demand-

ed application of other than state law, have both concerned programs different from the FmHA and SBA lending operations. *See Jones v. Federal Deposit Ins. Corp.*, 748 F.2d 1400 (10th Cir.1984) (FDIC regulations, rather than state law, adopted as uniform rule of federal law governing ownership of accounts on deposit); and *Marine Midland Bank v. United States*, 687 F.2d 395 (Ct.Cl.1982) (resort to state law inappropriate in cases of priority of liens arising from government defense procurement contracts, the creation of which, unlike FmHA and SBA loans, generally does not follow individual state practices).

Plaintiff attempts to distinguish the present case from *Kimbell Foods*, arguing any constructive release of its security interest under state law would conflict with federal law contained in 7 C.F.R. § 1962.17 (1985), which provides that "[c]hattel security may be released only when release will not be to the financial detriment of FmHA." This Court has serious reservations about whether an administrative regulation is the sort of congressional proclamation the Supreme Court referred to in *Kimbell Foods*. But even assuming that in an appropriate case the Regulations of the Department of Agriculture, rather than nondiscriminatory state commercial law, might become the "federal rule of decision," that result is not justified here. 7 C.F.R. § 1962.17 (1985) is merely a program regulation addressing the circumstances in which FmHA officers and agents have the authority to affirmatively release security interests. It does not purport to, and cannot be interpreted to, govern the priorities of FmHA security interests and competing interests acquired under state commercial law. To read that regulation in the manner plaintiff urges would mean not only that state commercial law could *never* apply when the result would be detrimental to the FmHA, but as well, that on the merits the agency would always prevail, without regard for the status and rights of the competing party under state law. Clearly, the Department of Agriculture could not have dictated that

result, nor did it intend to in the regulation on which plaintiff relies.

In another novel argument plaintiff contends K.S.A. 84–9–403 should not apply to this case because the statute imposes on the government the doctrine of laches. This argument misconstrues the nature of both that doctrine and this case.

■ Laches is an equitable device to bar stale claims in certain instances. *Perpetual Royalty Corp. v. Kipfer*, 253 F.Supp. 571 (D.Kan.1965), *aff'd* 361 F.2d 317 (10th Cir.1966), *cert. denied* 385 U.S. 1025, 87 S.Ct. 743, 17 L.Ed.2d 673 (1967). The question of laches is addressed primarily to the discretion of the court. *Russell v. Price*, 612 F.2d 1123 (9th Cir.1979), *cert. denied sub nom Drebin v. Russell*, 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980). Equity will not act when there is an adequate remedy at law. *Record Head, Inc. v. Olson*, 476 F.Supp. 366 (D.N.D. 1979). Plaintiff has not sued under equity. The FmHA attempted to protect its interests under the Kansas UCC, and now brings suit under common law, seeking damages for conversion. Defendant has shown plaintiff simply failed to properly maintain its perfected security interest under Kansas law. Plaintiff's response, that the *statute* requiring that result wrongly imposes the *equitable* bar of laches, is inherently contradictory. Laches has nothing to do with statutory enactments; equity in that sense does not enter into this case. If it appears the absence of a remedy at law is due to plaintiff's failure to pursue that remedy, equity will not intervene. *Smaldone v. Kurtz*, 450 F.Supp. 1138 (D.D.C.1978).

■ It is true that without a clear manifestation of congressional intent the United States is not bound by state statutes of limitation. *Cassidy Commission Co. v. United States*, 387 F.2d 875, 880 (10th Cir.1967). But *Kimbell Foods* was nothing if not an invitation to Congress to respond to the principle the government is bound by both the substantive and procedural requirements of the UCC as adopted in the majority of states. Congress has not

**634**

done so, at least regarding the FmHA. Plaintiff fails to show current federal law is significantly different than that in effect when *Kimbell Foods* was decided. The Court has no difficulty with inferring congressional acceptance of that decision; as a result, the FmHA continues to be bound by state commercial laws. In light of *Kimbell Foods* and its progeny, this Court would be remiss if it failed to apply the Kansas UCC in this case.

The next question is whether Kansas law requires a judgment for defendants on the merits. K.S.A. 84–9–403(2) provides:

> ... [A] filed financing statement is effective for a period of five (5) years from the date of filing. The effectiveness of a filed financing statement lapses on the expiration of the five-year period unless a continuation statement is filed prior to the lapse. If a security interest perfected by filing exists at the time insolvency proceedings are commenced by or against the debtor, the security interest remains perfected until termination of the insolvency proceedings and thereafter for a period of sixty (60) days or until expiration of the five-year period, whichever occurs later. Upon lapse the security interest becomes unperfected, unless it is perfected without filing. If the security interest becomes unperfected upon lapse, it is deemed to have been unperfected as against a person who became a purchaser or lien creditor before lapse.

Under this provision, after filing lapses the interest of the secured party is subject to defeat by purchasers and lienors even though before lapse the conflicting interest may have been junior. K.S.A. 84–9–403, Official UCC Comm. 3. Subsection (2) above does not vary from the 1972 Official UCC Text.

■■■■ Plaintiff does not dispute that the FmHA failed to file a continuation statement covering its May 22, 1978 financing statement. Under K.S.A. 84–9–403(2) that financing statement lapsed five years later, on May 22, 1983. Defendant Central Livestock, which gave value for and received the livestock in 1981, was a buyer in the ordinary course of business as defined in K.S.A. 84–1–201(9). Plaintiff's status as an unperfected financing statement, relates back in time to 1981 as against Central, a post-perfection, pre-lapse purchaser. K.S.A. 84–9–403(2). The rights of the two parties are governed by K.S.A. 84–9–301(1)(c), which states that an unperfected security interest is subordinate to the rights of a buyer of farm products in the ordinary course of business. Defendant Central is entitled to judgment on the merits.

IT IS ACCORDINGLY ORDERED this 23 day of August, 1985, that summary judgment be entered in favor of defendant Central Livestock Corporation on plaintiff's claim of conversion of certain specified livestock valued at $29,755.81.